UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AMANDA PERRY,

                Plaintiff,                        Case No. 15-cv-11040

v.                                      Honorable Thomas L. Ludington

COVENANT MEDICAL CENTER, Inc.,

                Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Amanda Perry filed suit against her former employer, Defendant Covenant Medical Center ("Covenant") on March 19, 2016, claiming that she was wrongfully terminated from her position as an office coordinator for a group of physicians. Specifically, Perry claims that Covenant violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, *et seq*., and Michigan's People with Disabilities Civil Rights Act ("PWDCRA") when it terminated her employment.

On December 21, 2015 Defendant Covenant filed a motion for summary judgment, seeking judgment on both of Perry's claims. Mot. for Summ. J., ECF No. 18. The motion will be denied. Perry has demonstrated that a question of material fact exists regarding whether Defendant's proffered reason for terminating her employment was pretextual under both the FMLA and the PWDCRA.

## I.

Plaintiff Perry began her employment with Defendant Covenant on September 17, 2010 as a part-time biller. Mot. for Summ. J. Ex. 1. She eventually received a full-time position, and

was then promoted to the position of Office Coordinator on August 26, 2012. *Id.* at Ex. 2.   In her new position, her initial assignment was to coordinate the physician practices at Covenant's Bridgeport and Frankenmuth locations. *Id.* at Ex. 3.

On March 4, 2014 Plaintiff Perry requested intermittent FMLA leave in order to take care of her son, who had been in a car accident. *Id*. at Ex. 7.  Human resources approved the leave request on March 5, 2014. *Id*.

On May 3, 2014, Perry's supervisor provided her with an annual performance evaluation. *Id*. at Ex. 6.  Perry received high scores in the areas of "Working Together", "Excellence", "Customer Service", "Accountability", "Enthusiasm", "Quantity of Work", "Quality of Work" and "Responsiveness". *Id*. She received average scores in the areas of "Respect" and "Communication". *Id*. Overall, her performance was ranked as exceeding expectations, and her evaluation stated, "Amanda is an asset to Covenant and CMGG. She demonstrates a positive attitude and enthusiasm while performing her job duties.  She willingly embraces challenges and consistently seeks opportunities to improve quality and managed care revenue." *Id*.

Defendant alleges that during the late spring and early summer of 2014, Perry had a number of performance issues at work. Specifically, Defendant contends that Ms. Krueger began having concerns with the way Perry communicated and handled conflict with her staff in mid-May regarding the termination of a probationary employee.  The only evidence that Defendant offers in support of these claims of early performance issues are notes taken by Ms. Krueger dated months after the alleged incidents took place and Ms. Krueger's own partial deposition testimony. *See* Mot. for Summ. J. Ex. 8; Ex. 5 at 11-12.  In her response to summary judgment, Perry challenges this documentation as an "after-the-fact attempt to build a paper trail…."  Resp. to Summ. J. 20.

**A.**

That summer Perry began suffering from numerous mental health issues, both resurgent and newly diagnosed. Perry testified that in July of 2014 she informed Ms. Kreuger that she had previously been diagnosed with bipolar disorder. Perry Dep. 23-24. Perry testified that she informed Ms. Kreguer of her diagnosis because she was "crying nonstop", "having suicidal feelings" and that she "just wanted to die, but [] had to stay alive for her grandson and kids." *Id*. at 29-30. She also testified that she had not yet been diagnosed with Post-Traumatic Stress Disorder ("PTSD") at that time and "didn't know what was going on." *Id*. at 24. During her deposition, she acknowledged that she was worried about her mind shattering, and was not capable of working at that time. *Id*. at 30-31.

On July 23, 2014 Perry obtained a note from Jessica Frantz, PA-C that excused Perry from missing work from July 22, 2014 to July 25, 2014 due to medical reasons. Resp. to Summ. J. Ex. 6. The next day, July 24, 2014, employee Cheryl Thompson filled out a Notification of Need for Leave of Absence form for Perry, noting that Perry required intermittent leave beginning on July 22, 2014. *Id*. Ex. 7. Then, on July 28, 2014, Perry requested intermittent leave under the FMLA for her own serious health condition. *Id*. at Ex. 8. In the event that her FMLA request was denied, she alternatively requested personal leave due to "Bipolar II Exacerbation/nervous breakdown & post-traumatic stress disorder." *Id*.

Perry's intermittent FMLA request was approved on August 5, 2014. *Id*. at Ex. 9. Perry testified that she initially took just a day or two off, but then took off from August 12 to August 14. Perry Dep. 25, 28. She testified that she met with Ms. Krueger after returning to work that Friday, August 15, 2014. *Id*. During the meeting, Ms. Krueger informed Perry that she had been in contact with HR, and that they thought it best if Perry went on continuous leave to "get it

together." *Id.* at 26. Ms. Krueger's notes from the meeting indicate that she mandated continuous FMLA leave, and that she told Perry to stop disclosing personal details to her, but to instead report them to HR. *Id.* at Ex. 10.  Ms. Krueger's notes also indicate that she told Perry that she needed to be able to perform her job at "100% functionality when she returns." *Id.*   Perry testified she was not capable of working at that time, and she agreed with Ms. Krueger that she needed to take time off to get herself together. Perry Dep. 30-31.  The following Monday, Perry submitted paperwork for continuous leave. *Id*; *See also* Resp. to Summ. J. Ex 11.

## B.

Perry returned to work from her continuous FMLA leave on October 6, 2014. Perry Dep. 33.  Upon her return, Perry discovered that Covenant had reorganized the responsibilities of three out of the four office coordinators while she was out on leave.  *Id.* at 33-35.  Perry was no longer responsible for the Frankenmuth and Bridgeport offices, but was instead assigned to Bay City and Freeland. *Id.* at 34.  Upon hearing of her reassignment, Perry became upset and cried. *Id.* Perry testified that Ms. Krueger did not take her to the office or introduce her to the staff or doctors.  *Id.* at 54.  She also testified that she was not allowed to retrieve her log-in books and files where she had left them at the Bridgeport office.  *Id.*  She did not receive her books and files until a week later when Ms. Krueger brought them to her. *Id.* at 55.

After returning from FMLA leave, Perry continued to request time off from work to attend Doctor's appointments.  In response to these requests, Ms. Krueger emailed Perry to tell her that, in addition to requesting time off in the system, Perry would have to e-mail Ms. Krueger her time off requests because they had been "so short staffed" and it was the only way that Ms. Krueger could "keep it straight." Ms. Krueger also informed Perry that she was responsible for

making arrangements to have her responsibilities covered when she needed to be out. Resp. to Summ. J. Ex. 12.

**i.**

Two weeks after her return from FMLA leave, on October 21, 2014, Ms. Krueger placed Perry in Step One of Covenant's progressive disciplinary procedure.  Ms. Krueger documented that she had verbally counseled Perry regarding violations of Covenant's standards of conduct related to an incident with a patient who had called in to renew his prescriptions. Mot. for Summ. J. Ex. 11. According to Ms. Krueger's report, after Perry spoke with the patient on the phone on October 13, 2014 the patient complained to Doctor Hamade that Perry was rude and abrupt. *Id*. The patient had allegedly threatened to remove his entire family from the practice. *Id*. Perry contended that she had not been rude to the patient, but that the patient had been rude to her.  *Id*.

The Step One documentation also states that on October 14, 2014 Ms. Krueger had received a complaint from an employee that Perry was "displaying anger and frustration when the telephone would ring" and that Perry informed the employee that her job "was too much for one person to do." *Id*. The employee also informed Ms. Krueger that Perry was abrupt in responding to her questions.  *Id*.  Finally, the Step One discipline report noted that on October 17, 2014 Doctor Hamade complained to Ms. Krueger that Perry had been rude and abrupt when he asked her to take care of a prescription that he had signed. *Id*.  Both Ms. Krueger and Perry signed the Step One discipline report. *Id*.

**ii.**

Perry did not progress to Step Two discipline, but instead received Step Three disciplinary counseling on November 18, 2014. Mot for Summ. J. Ex. 12.  The Step Three discipline was partially based on an incident on November 10, 2014, in which Perry was

- 5 -

informed at 8:39 AM that a TCA was required to attend a meeting in HR at 1:00 PM, and that Perry should therefore work with the providers who would be short-staffed while the TCA was gone. *Id.* When the TCA arrived at the meeting, she informed Ms. Krueger that Perry had notified neither the office nor the providers that the TCA would be gone, but had just texted the TCA to tell her that she was required to go to HR. *Id.* According to the discipline report, this behavior constituted poor communication and leadership, and a failure to follow through on manager instructions. *Id.* Perry contended that she did in fact notify the office that the TCA would be gone. *See* Mot. for Summ. J. Ex. 15.

The Step Three discipline was also based on an incident in which Perry displayed poor communication with a "midlevel" who was making numerous coding errors in the online system. *Id.* Ms. Krueger had informed Perry to speak with the midlevel to determine what the nature of the coding problem was. *Id.* The midlevel later informed Ms. Krueger that Perry just told her that she needed more system training, and that Perry's communication was abrupt and lacked detail and information. *Id.* The discipline report noted that "[t]he ability to effectively and specifically communicate with providers and the practice personnel is a performance expectation and requirement for Practice Coordinators." *Id.*

The Step Three discipline was also based on a November 14, 2014 incident in which Perry cried and displayed "unprofessional emotional behavior" while working at the front desk in the Freeland office. *Id.* According to the discipline report, three office staff personnel and providers witnessed Perry crying at the front desk and informed Ms. Krueger of the incident. The report stated that Perry's behavior was disruptive and that patients were present in the waiting room at the time and could see Perry in the office. *Id.* The report further noted that Perry's behavior violated the standard of conduct set forth in Policy 509. *Id.* In response, Perry claimed

that she had just teared up and that no patients had been present to witness the incident. *See* Mot. for Summ. J. Ex. 15.

Finally, the Step Three discipline report noted that Perry provided unsatisfactory telephone messages to the providers, and that Perry was not properly training new employees on the proper documentation of patient information and messages. *Id*. Both Perry and Ms. Krueger signed the Step Three Discipline report.

### iii.

After her Step-Three disciplinary counseling, Perry applied for review of her discipline pursuant to Covenant's Alternative Dispute Resolution appeal procedure. *See* Resp. to Summ. J. Ex. 17. Pursuant to that process, an employee may submit documentation and submit witnesses to challenge disciplinary actions. *Id*.

To challenge her Step One discipline Perry asked a subordinate, Carly Roque, to prepare a statement on her behalf. Perry Dep. 56. In her statement, Ms. Roque stated that she had witnessed a phone call between Perry and a patient in October, 2014. *Id*. Ms. Roque further stated that the patient was requesting a refill of his medication, but that he had not had an appointment in about a year, so Perry requested that he come in to the office for an appointment. *Id*. Ms. Roque stated that Perry did not yell and was not rude to the patient. *Id*.

To challenge her Step Three discipline Perry asked another subordinate, Kim Scales, to prepare a statement on her behalf regarding the incident in which Perry cried in the office. Specifically, on a Saturday Perry asked Ms. Scales to provide a statement that there were no patients in the waiting room at the time of the incident. Perry Dep. 58. Perry also told Ms. Scales that she needed a witness statement from her that she had called her on the day that the TCA had to attend the meeting at HR. *Id*. Perry testified that in asking Ms. Scales to prepare such a

- 7 -

statement, "I said, I remember telling you this, this, this, and this. And she agreed to do the witness statement." *Id*. Perry asked Ms. Scales to have the statement ready by that Monday evening. *Id*. at. 59.

When Perry went to the office to collect the statements, Ms. Roque provided Perry with a witness statement, but Ms. Scales did not. *Id*.  Instead, Ms. Scales acted nervous, and asked Perry if she could provide Perry with the statement the next day since she was "too busy" that day. *Id*. The next morning, Perry texted Ms. Scales to say, "[l]et me know if you need me to cover so you can do that note.  It doesn't have to be anything crazy long just the facts. Even handwritten. And you could even fax it to me. Just let me know." Resp. to Summ. J. Ex. 19; *See also* Perry Dep. 60.  Perry then sent another message stating, "[i]f you don't want to do it it's fine too. Just let me know." Resp. to Summ. J. Ex. 19. In response, Ms. Scales texted Ms. Perry, "Mandy I feel bad for what your [sic] going through right now.  I just feel like with me being new I don't really want to get involved.  I was thinking over the weekend and I don't recall the details of what we discussed. I'm sorry." *Id*.

### iv.

This attempt to obtain witness statements ultimately led to Perry's Step Four discharge. According to the Step Four discharge report, a midlevel working in Perry's practice informed Ms. Krueger that Perry had contacted both Ms. Roque and Ms. Scales to write statements on her behalf. Reps to Summ. J. Ex. 21.  Ms. Kreuger called both Ms. Roque and Ms. Scales and verified that Perry had indeed asked them for witness statements. *Id*.  Ms. Scales informed Ms. Krueger that Perry had asked her to make two statements on her behalf: (1) that Ms. Scales "recalled the conversation that [Perry] had with her regarding office staffing and the provider schedules pertaining to the date/time that one of the clinical staff needed to report to HR for a

meeting" and (2) "that there were no patients in either the office or the waiting room on the Friday that [Perry] was upset and crying at the front desk." *Id*. The Step Four report notes that this conduct constituted "[f]alsifying claims, records, or reports including incident reports…" and "[i]mmoral, indecent, illegal, or unethical or dishonest conduct or behavior" under Policy #509. Perry was discharged, effective November 25, 2014. *Id*. She refused to sign the Step Four report. *Id*. Perry also received a notice of termination, stating that she had been discharged due to her "[i]nability to perform as an effective leader." Resp. to Summ. J. Ex. 21.

## C.

Perry challenged both her Step Three corrective action and her Step IV discharge. The disciplinary actions were first upheld by Ms. Krueger on December 8, 2014. Resp. to Summ. J. Ex. 23. Perry then met with David H. Nall, the vice president of the Covenant physician network. Rep. to Summ. J. Ex. 24. After the meeting, Mr. Nall again upheld Perry's discharge in a letter dated January 12, 2015. *Id*. Mr. Nall's letter explained that, while Perry had the ability to complete task-oriented responsibilities, her "challenges came with the skills and abilities required to lead and advise staff amongst various levels of communication and establishing expectations." *Id.*

Perry responded by filing suit on March 19, 2015. ECF No. 1. In her complaint, Perry alleges that her termination violated the FMLA's anti-retaliation provision, 29 U.S.C. § 2615(a)(2) and the PWDCRA's prohibition against discriminating against persons with disabilities, MCL § 37.1202(1)(b). After the close of discovery, on December 21, 2015 Defendant Covenant moved for summary judgment on both of Perry's claims. ECF No. 18.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## A.

Defendant first moves for summary judgment as to Perry's FMLA retaliation claim. The FMLA entitles employees to an annual total of twelve weeks of leave for a number of reasons including, inter alia, because of a "'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir.2003) (quoting 29 U.S.C. § 2612(a)(1)(D)). Upon returning from FMLA leave, an employee must be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment. 29 U.S.C. § 2614(a)(1). The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id.* at § 2615(a)(2).

The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: (1) the "interference" theory arising under § 2615(a)(1), and (2) the "retaliation" theory arising from § 2615(a)(2). *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). Plaintiff Perry brings her FMLA claim under the retaliation theory. ECF No. 1, ¶¶ 48-60. The central question in an FMLA retaliation case is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir.2006). In answering that question, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id.*

### i.

Where, as here, a plaintiff sets forth an FMLA retaliation claim based on circumstantial evidence alleging a single motive for discrimination, it is evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir.2012). Plaintiff thus had the initial burden of establishing a prima facie case of retaliation by showing: (1) Plaintiff was engaged in a statutorily protected activity; (2) Defendant knew that Plaintiff was exercising her FMLA rights; (3) Plaintiff suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action. *Id.* at 761. For the purposes of its motion for summary judgment only, Defendant concedes that Perry has established a prima facie case of retaliation. Mot. for Summ. J. 12.

### ii.

Once a plaintiff establishes a prima facie case the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at

761-62.  A defendant is not required to meet this burden by a preponderance of the evidence, but rather "the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

In its motion for summary judgment, Defendant argues that Perry's employment was terminated because she was "consistently unable to meet the reasonable expectations of her job." Mot. for Summ. J. 12.   Defendant argues that this was evidenced by Perry's poor communication, poor management, and ultimately, an incident in which she attempted to pressure a subordinate into providing a false statement on her behalf. *Id.*  Poor performance, as alleged by Defendant, is a legitimate, non-retaliatory reason for terminating an employee. *See Johnson v. United States Dept. of Health and Human Services*, 30 F.3d 45, 47 (6th Cir. 1994).

### iii.

Because Defendant has satisfied its burden of production, the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reason for terminating her employment was pretextual. A plaintiff generally shows pretext by showing that the proffered reason: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998); *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds). However, as noted by the Sixth Circuit, "[t]he three-part test need not be applied rigidly. Rather, [p]retext is a commonsense inquiry: did the employer fire the

employee for the stated reason or not?" *Blizzard v. Marion Technical College*, 698 F.3d 275, 287 n.6 (6th Cir. 2012).

**a.**

Plaintiff Perry first attempts to show pretext through the first method, arguing that Defendant's alleged reason for terminating her had no basis in fact. Perry contests each ground that her progressive discipline was based on, arguing that she was not rude to a patient, did not cry in front of patients, did not communicate poorly with fellow employees, and did not ask subordinates to supply false statements but only asked them to write what they witnessed. Perry argues that Defendant's claim that she had poor communication and management skills is belied by her "Exceeds Expectations" score on her May, 2015 performance review. Perry also argues that Defendant provided her with shifting and inconsistent reasons for her discharge.

In arguing that Plaintiff did not satisfy her burden of showing that Defendant's proffered reason for terminating her employment has no basis in fact, Defendant relies on the "honest belief rule." This rule provides that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1117 (6th Cir. 2001). To determine whether Defendant had an honest belief that Plaintiff was poorly performing her job, the Court must look "to whether [Defendant] can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken* Co.¸258 F.3d 488, 494 (6th Cir. 2001). In this regard, the decisional process used by the employer need not be optimal or leave "no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d at 807. "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an

adverse employment action." *Id*. Although the Court must not "blindly assume that an employer's description of its reasons is honest," the Court should "resist attempting to micro-manage the process used by employers in making their employment decisions." *Id*. "When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id*. at 807-08.

Defendant claims that it honestly believed that Plaintiff Perry was unable to meet the reasonable expectations of her job. In support of this contention, Defendant points to notes compiled by Ms. Krueger regarding complaints allegedly received from third parties prior to Perry's continuous FMLA leave. *See* Mot. for Summ. J. Ex. 8. These notes are unsubstantiated even by Ms. Krueger's own deposition testimony, and will be disregarded.[1]

Defendant also points to Perry's disciplinary reports cataloging Perry's progressive discipline after her return from continuous FMLA leave. *See* Mot. for Summ. J. Ex. 11-13. The discipline reports set forth alleged complaints that Ms. Krueger received from third parties regarding Perry's poor performance. *Id.* While substantiated in part by Ms. Krueger's deposition testimony, each of the reports was prepared by Ms. Krueger, who was also Perry's direct supervisor, the person who made the decision to terminate Perry, and the person who initially upheld the termination decision after Perry appealed. Defendant has not provided this Court with any depositions or affidavits of any other Covenant employees to substantiate Ms. Krueger's testimony or reports.

Importantly, Perry disputes the basis of each step of her discipline in both her initial appeal and in her deposition. *See* Mot. for Summ. J. Ex. 15. The case therefore presents a

---

[1] The Court considers only the excerpts of Ms. Krueger's deposition that has been provided by the parties.

question of Perry's word against Ms. Krueger's. A determination of the case thus depends on an assessment of the credibility of both Perry and Ms. Krueger, which is for a jury to determine. If a jury determines that Ms. Krueger, the decision maker, is not credible, then the jury could also determine that Defendant did not honestly believe that Perry was poorly performing her job. Construing the evidence in the light most favorable to Perry, Defendant's motion for summary judgment must be denied.

### b.

Defendant also asserts that Plaintiff did not satisfy her burden of proving that the alleged poor performance did not actually motivate the termination of her employment under the third method of proving pretext. To establish pretext by advancing some evidence that the proffered explanation did not actually motivate the discriminatory action, a plaintiff can "attack[] the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (citation omitted) (quoting *Manzer*, 29 F.3d at 1084) (internal quotation marks omitted). To make a showing of pretext in this manner, "plaintiff may not rely simply upon his prima facie evidence but must, instead introduce additional evidence of ... discrimination." *Manzer*, 29 F.3d at 1084.

### 1.

Perry argues that the temporal proximity of her return from continuous FMLA leave and her placement in Step One discipline is a strong indicator of pretext. Although "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason

for discharging an employee was in fact pretextual," *Skrjanc*, 272 F.3d at 317, temporal proximity can be used as indirect evidence to support a claim of pretext. *See Asmo*, 471 F.3d at 598.

Defendant alleges that temporal proximity provides weak evidence in this case, since Perry initially took FMLA leave on March 3, 2014 to care for her son. Perry's FMLA leave to care for her son was intermittent, and there is no evidence in the record that Perry took an extended amount of time off work. Perry began taking intermittent FMLA leave to care for her own serious medical issues on July 22, 2014, and went on continuous FMLA leave from August 15, 2014 to October 6, 2014. Two weeks after she returned from her continuous FMLA leave, on October 21, 2014 she was placed in Step-One discipline. Less than two months after her return from continuous FMLA leave she was discharged.

With respect to claims for FMLA retaliation, the Sixth Circuit has held that a span of less than three months is sufficient to create an inference of a causal connection. *See Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two."); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (holding that a three-month time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage). Here Perry's employment was terminated about one and a half months after she returned from her continuous FMLA leave. A jury could find that this close temporal proximity constitutes some evidence of retaliation.

**2.**

- 16 -

As noted above, temporal proximity alone is generally not enough to establish pretext. *Skrjanc*, 272 F.3d at 317.   Perry argues that temporal proximity, together with Defendant's shifting reasons for her discharge, different treatment after her return to work, after-the-fact creation of a paper trail, skipping Step Two of its disciplinary procedures, and hostile remarks by Ms. Krueger establish pretext such that Defendant's motion for summary judgment must be denied.

First, Perry attempts to argue that Defendant's shifting and inconsistent reasons for her discharge constitutes evidence of discrimination. Perry argues that her Step-Four discipline report states that she was terminated for asking a subordinate to falsify a witness statement.  She argues that she was then informed in her Notice of Separation that she was terminated due to her inability to be an effective leader, and was then informed in her appeal process that she lacked leadership skills and abilities.  An employer's changing and inconsistent rationales for making an adverse employment decision can call into question the credibility of the proffered reason and serve as evidence of pretext. *See Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir.2002). As pointed out by Defendant, however, there is no evidence that Defendant's rationale for terminating Perry changed in any way. Instead, the given reasons – asking a subordinate to falsify a witness statement, ineffective leadership, and lack of leadership skills and abilities – are consistent and related rationales. Defendant Covenant's assertions revolve around the single idea that Perry was an ineffective leader and manager who communicated improperly with her fellow employees and subordinates.

Perry also argues that the fact that she was treated differently after returning to work constitutes evidence of pretext.  "Where an employer treats an employee differently after she [engages in protected conduct] than before she had done so, a retaliatory motive may be

inferred." *Lamer v. Metaldyne* Co. LLC, 240 F. App'x 22, 30 (6th Cir. 2007). Plaintiff emphasizes her May 2014 performance review in which she received high marks in excellence accountability, quality of work, and responsiveness. Mot. for Summ. J. Ex. 6. Perry contrasts this performance review with the discipline she began receiving almost immediately after her return to work. While a jury could find that this different treatment was a result of Perry's declining performance, a jury could also find the different treatment was a result of impermissible retaliation.

Next, Perry argues that Defendant's after-the-fact creation of a paper trail may constitute evidence of impermissible retaliation. Perry points to Defendant's Exhibit 8, comprising of Ms. Krueger documentation of complaints and grievances against Perry. Mot. for Summ. J. Ex. 8. The Sixth Circuit has held that "the deliberate building of an adverse file on an employee can, on the right set of facts, constitute evidence of pretext." *Oldham v. Merrill, Lynch, Pierce, Fenner & Smith, Inc*., 124 F.3d 198, *4 (6th Cir. 1997). Many of the events listed in Exhibit 8 are wholly unsubstantiated, even by Ms. Krueger's own deposition testimony, and many of the incidents were not documented until months after their alleged occurrence. Mot. for Summ. J. Ex. 8. Furthermore, they were documented by a single person – Ms. Krueger. A jury could determine that this unsubstantiated record constitutes an after-the fact attempt to build a paper trail to buttress Defendant's justification for terminating Perry's employment. It therefore may constitute some evidence of pretext.

In addition to these arguments, Plaintiff Perry emphasizes the fact that Defendant skipped Step Two of its progressive disciplinary procedures. Perry also points to Ms. Krueger's "hostile" handwritten notes indicating that she mandated Perry to go on continuous FMLA leave and conveyed that Perry had to be at 100 percent performance upon her return. Mot. for Summ. J. Ex.

- 18 -

10.  All of this evidence together creates a material question of fact as to the actual motive for Perry's termination.  Because a jury could find that poor performance was not the real reason for Perry's termination and that FMLA retaliation was the real reason, Defendant's motion for summary judgment will be denied on this ground as well.

**B.**

Defendant also seeks summary judgment on Plaintiff's disability discrimination claim, in which Plaintiff alleges that Defendant violated the PWDCRA by terminating her employment because of her disability.  "[T]he PWDCRA generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that, with or without accommodation, do not prevent he disabled individual from performing the duties of a particular job."  *Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004).

To establish a prima facie case of discrimination under the PWDCRA, a plaintiff must establish: (1) that she is disabled as defined by the PWDCRA; (2) that the disability is unrelated to her ability to perform the duties of her particular job; and (3) that she was discriminated against in one of the ways described in the statute.  *Peden*, 680 N.W.2d at 863.  Consistent with the tripartite analysis set forth in *McDonnell Douglas*, the defendant must then provide nondiscriminatory reasons for the adverse action.  *Vorachek v. Security Federal Credit Union*, 2009 WL 4506440, at *3 (E.D. Mich. Dec. 1, 2009).

**i.**

Defendant argues that Perry is unable to establish a prima facie case of discrimination under the FMLA because Perry's disability was related to her ability to perform her job duties.  Defendant emphasizes Perry's testimony that, prior to taking FMLA leave, she informed Ms.

Krueger of her diagnosis in July, 2014, and that upon her return on October 6, 2014, Perry did not ask for any special accommodation other than occasional time off for medical appointments. Perry Dep. 70. Defendant also emphasizes Perry's testimony that she informed Ms. Krueger of her diagnoses because she was crying non-stop and having suicidal feelings, and that she and her physician admitted during that time that Perry was incapable of performing her job when she had "flare-ups".

Perry counters that Defendant has presented no evidence that Perry was unable to perform her job *after her return* from FMLA leave. Accordingly, Perry argues that Defendant has presented no evidence that she was unable to perform the duties of her job at the time she was terminated. *See Demyanovich v. Cadon Plating & Coatings*, L.L.C., 747 F.3d 419, 434 (6th Cir. 2014). Construing the evidence in a light most favorable to Perry, Perry has created a prima facie case of discrimination under the PWDCRA.

### ii.

Because Perry has established a prima facie, Defendant bears the burden of articulating a legitimate, nondiscriminatory reason for terminating her. *Id*. at 434. As Defendant argued in response to Perry's FMLA retaliation claim, Defendant contends that Perry was terminated because she was consistently unable to perform the duties of her job. For the reasons discussed above, there is a genuine, material dispute as to whether that justification is pretextual. Defendant's motion for summary judgment will therefore be denied as to Perry's claim under the PWDCRA.

### III.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 18, is **DENIED**.

- 20 -

Dated: March 7, 2016                    s/Thomas L. Ludington
                                        THOMAS L. LUDINGTON
                                        United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on March 7, 2016.

                          s/Michael A. Sian
                          MICHAEL A. SIAN, Case Manager