UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AMANDA PERRY,

                Plaintiff,                          Case No. 15-cv-11040

v.                                        Honorable Thomas L. Ludington

COVENANT MEDICAL CENTER, Inc.,

                Defendant.

_____/

**ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A
MATTER OF LAW, DENYING DEFENDANT'S MOTION FOR ORDER OF
JUDGMENT AS MOOT, GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR PREJUDGMENT INTEREST AND LIQUIDATED
DAMAGES, GRANTING IN PART PLAINTIFF'S MOTION FOR ATTORNEY FEES,
AND DIRECTING SUBMISSION OF PROPOSED JUDGMENT**

Plaintiff Amanda Perry filed suit against her former employer, Defendant Covenant
Medical Center ("Covenant") on March 19, 2016, claiming that she was wrongfully terminated
from her position as an office coordinator for a group of physicians.  Specifically, Perry claimed
that Covenant violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, *et seq*., and
Michigan's People with Disabilities Civil Rights Act ("PWDCRA") when it terminated her
employment.

On December 21, 2015 Defendant Covenant filed a motion for summary judgment,
seeking judgment on both of Perry's claims. Mot. for Summ. J., ECF No. 18.  Because
Defendant did not demonstrate the absence of any material questions of fact, Defendant's motion
was denied, and a jury trial commenced on June 14, 2016. At the close of Plaintiff's case,
Defendant moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure
50(a). The Court took the motion under advisement and submitted the issue to the jury. After

deliberating, the jury returned a verdict in favor of Plaintiff and against Defendant in the amount of $500,000. ECF No. 37. Defendant then renewed its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or in the alternative for a new trial. *See* ECF No. 40. Based on the following, Defendant's renewed motion for judgment as a matter of law will be denied, and judgment will be entered in favor of Plaintiff. Plaintiff's post-trial motions for prejudgment interest, liquidated damages, attorneys' fees, and costs will also be resolved.

## I.

Plaintiff Perry began her employment with Defendant Covenant on September 17, 2010 as a part-time biller. Perry Tr. 5-7. She eventually received a full-time position, and was then promoted to the position of Office Coordinator on August 26, 2012. *Id.* at 8, 10-11.   In her new position, her initial assignment was to coordinate the physician practices at Covenant's Bridgeport and Frankenmuth locations. *Id.* at 11-12.

In January of 2014, Covenant replaced Perry's supervisor with a woman named Rebecca Krueger. *Id.* at 14-15. On March 4, 2014 Plaintiff Perry requested intermittent FMLA leave in order to take care of her son, who had been in a car accident. *See* Perry Tr. 19-20; Trial Exs. 9-12. Human resources approved the leave request on March 5, 2014. *Id.* As a result Perry took off work continuously from March 4, 2014 to March 12, 2014.  Perry Tr. 19-20. She does not allege that Defendant subjected her to any discrimination or retaliation for exercising her FMLA rights on this occasion.

Perry received mostly positive reviews throughout her time with Covenant, and an "Exceeding Expectations" review as recently as May 3, 2014 from Ms. Krueger. *See* Trial Ex. 8. However, Defendant alleges that Perry began having performance issues at work in the late spring and early summer of 2014.

**A.**

Perry alleges that in the summer of 2014 she began suffering from numerous mental health issues, both resurgent and newly diagnosed. Perry testified that in July of 2014 she informed Ms. Krueger of her previous bipolar disorder diagnosis. Perry Tr. 23-24. Perry testified that she informed Ms. Krueger of her diagnosis on July 21, 2014 because she was "crying nonstop and I felt rush of emotion.  I couldn't breathe. I was having chest pain, anxiety.  I was confused and I told Becky that I had to leave work." *Id*.  Perry proceeded to leave work at 2:30 on that date and scheduled an appointment with a physician's assistant. *Id*. Following her appointment, the Physician's Assistant filled out a physician's form certifying Perry for intermittent FMLA leave.  Accordingly, on July 28, 2014, Perry requested intermittent leave under the FMLA for her own serious health condition, which was approved by Covenant on August 5, 2014. *See* Trial Exs. 14-17. During her deposition, Perry acknowledged that she was worried about her mind shattering, and was not capable of working at that time.  Perry Dep. at 30-31.

Perry testified that she initially took just a day or two off from work, but then took off early on August 11 and stayed off until August 14. Perry Tr. 28-29.  She testified that she met with Ms. Krueger after returning to work that Friday, August 15, 2014.  *Id*.  During the meeting, Ms. Krueger informed Perry that she had been in contact with HR, and that they thought it best if Perry went on continuous leave to "get it together" and told Perry that she needed to be able to perform her job at 100 percent functionality upon her return. *Id*. at 30-35.  During her deposition Perry testified that she was not capable of working at that time, and agreed with Ms. Krueger that she needed to take time off to get herself together. Perry Dep. 30-31.

**B.**

- 3 -

Upon returning from her continuous leave on October 6, 2014 Perry discovered that Covenant had reorganized the responsibilities of three out of the four office coordinators. The change took place between August and September, and affected coordinators under Ms. Krueger's supervision. *See* Nail Tr. 3-4.  The change was intended to better align the geographic responsibilities for coordinators and address personnel issues. *Id.* As a result of the change, Perry was no longer responsible for the Bridgeport and Frankenmuth offices.  Perry Tr. 35-36. Instead, Perry was assigned to the Freeland office and two Bay City offices located in the same building. *Id.* at 38-39.

Upon her return Perry met with Ms. Krueger for about thirty minutes regarding her new assignment.  Perry Tr. 38. Perry testified that she was upset after the meeting.  *Id.* at 39. Perry also testified that she informed Ms. Krueger that she had left some things in the Bridgeport office that she needed to retrieve, including her work phone charger, billing and coding guidelines, and log in books and passwords. Ms. Krueger told her she could retrieve the items. *Id.* at 40-43. However, when Perry arrived at the Bridgeport office, the new Bridgeport office coordinator, Lydia Villanova, would not let her enter the building.  Perry testified that Ms. Villanova was not being nice, and informed Perry that Ms. Krueger would not let Perry retrieve her belongings until an unspecified meeting took place. *Id.* Ms. Krueger later informed Perry that the incident had been a misunderstanding. *Id.* Because Perry was required to report to work at her new offices that week, Ms. Krueger retrieved Perry's belongings for her on October 8, 2014, and eventually delivered them to Perry the next week. *Id.* at 42-43.  Perry alleged that in the meantime she was handicapped from properly performing her job. *Id.* at 42-45. However, Perry also admitted that the required payroll adjustment forms and billing and coding guidelines that she said she needed were available online.  *Id.*

On Saturday, October 11, 2014 Perry texted Ms. Krueger to tell her that she was scheduling a medical appointment for the following Monday, October 13, 2014. *Id*. at 46-47. As of that date Perry had around 59 hours remaining under the FMLA. *Id*. at 51. Ms. Krueger responded that in addition to requesting time off in Covenant's scheduling system Perry would need to e-mail Ms. Krueger her FMLA time off requests, and that Perry was responsible for making arrangements to have her responsibilities covered when she needed to be out. *Id*. at 47-48. Because Perry could not find coverage, she had to reschedule her appointment for Friday, October 17, 2014. *Id*. at 51-52.

**i.**

The following Tuesday, on October 21, 2014, Ms. Krueger placed Perry in Step One of Covenant's progressive disciplinary procedure. *See* Trial Ex. 24. Perry testified that it was the first discipline she had ever received. Perry Tr. 52. Ms. Krueger documented that she had verbally counseled Perry regarding violations of Covenant's standards of conduct related to an incident with a patient who had called in to renew his prescriptions on October 13, 2014. *Id*. According to the report, the patient complained to Doctor Hamade that she had been rude to him and threatened to remove his family from the practice. *Id*. Perry contended that she had not been rude to the patient but that the patient had been rude to her. *Id*. One of Plaintiff's subordinates, Carly Roque, testified that she witnessed Perry's side of the conversation at issue and that she did not believe Perry had been rude. *See* Roque Tr. 1-2.

The Step One documentation also states that on October 14, 2014 Ms. Krueger had received a complaint from an employee that Perry was "displaying anger and frustration when the telephone would ring" and that Perry informed the employee that her job "was too much for one person to do." *See* Trial Ex. 24. Perry acknowledged making those statements in her

testimony. *See* Perry Tr. 57-58. The employee also informed Ms. Krueger that Perry was abrupt in responding to her questions. *See* Trial Ex. 24. This report was bolstered by the testimony of a newly-hired medical assistant named Kimberly Scales, who testified that she had reported to Ms. Krueger concerns that Perry did not treat patients kindly or with respect and her perception that Perry was often frustrated at work. *See* Scales Tr. 11. A number of Perry's future write-ups also involved issues with Ms. Scales. Finally, the Step One discipline report noted that on October 17, 2014 Doctor Hamade complained to Ms. Krueger that Perry had been rude and abrupt when he asked her to take care of a prescription that he had signed. *Id*. Perry testified that the incident occurred while she was attempting to leave the office for her Doctor's appointment on October 17, 2014. *See* Perry Tr. 60. Both Ms. Krueger and Perry signed the Step One discipline report. *See* Trial Ex. 24. At the time, Perry told Ms. Krueger that the discipline served as a needed wake-up call. *See* Perry Tr. 111.

### ii.

Following her Step One discipline, Perry continued to experience difficulties at work. However, Ms. Krueger did not advance Perry to Step Two discipline, but instead moved her directly to Step Three disciplinary counseling on November 18, 2014. *See* Trial Ex. 26. The Step Three discipline, issued by Ms. Krueger, was based on two alleged incidents of poor communication with subordinates, and one incident in which she had displayed "unprofessional emotional behavior" in front of patients while working at the front desk in one of Covenant's offices. *Id.* The Step Three discipline report also noted that Perry provided unsatisfactory telephone messages to the providers, and that Perry was not properly training new employees on the proper documentation of patient information and messages. *Id.* Both Perry and Ms. Krueger signed the Step Three Discipline report.

One of the foundations for Perry's Step Three discipline was a training issue raised by the newly-hired Ms. Scales, who was Perry's subordinate. *See* Scales Tr. 9-10. Ms. Scales testified that despite having over 30 years of experience in the medical field, she had trouble using Covenant's Epic computer system during the early days of her employment in October of 2014. *Id.* Two days after beginning her employment with Covenant, Ms. Scales allegedly informed Ms. Krueger that she was not receiving adequate training and that Perry seemed annoyed when she asked questions. *Id.* As reflected in the Step Three discipline, Ms. Scales informed Ms. Krueger that Perry told her that she needed more system training, and that Perry's communication was abrupt and lacked detail and information. *Id.* The discipline report notes that "[t]he ability to effectively and specifically communicate with providers and the practice personnel is a performance expectation and requirement for Practice Coordinators." *See* Trial Ex. 26. Perry testified that she had not been abrupt, but that Ms. Scales was struggling to grasp basic concepts on the EPIC system. *See* Perry Tr. 122-123.

The second incident upon which Perry's Step Three discipline was based occurred a week earlier, on November 10, 2014, and involved a medical assistant named Amanda Schreur who had an appointment with the HR department. Scales Tr. 5. According to the report Perry was informed at 8:39 AM that Ms. Schreur was required to attend a meeting in HR at 1:00 PM, and that Perry should therefore work with the providers who would be short-staffed while Ms. Schreur was gone. *See* Trial Ex. 26. When Ms. Schreur arrived at the meeting, she allegedly informed Ms. Krueger that Perry had not notified the office or providers that she would be gone, but had just texted her to tell her that she was required to go to HR. *See* Trial Ex. 26. According to the discipline report, this behavior constituted poor communication and leadership, and a failure to follow through on manager instructions. *Id.* Perry contended that she did in fact notify

the office that Ms. Schreur would be gone, and spoke directly to Ms. Scales. *See* Perry Dep. 66-67. But Ms. Scales disputed this, testifying that Perry had never called to inform her of necessary preparations for Ms. Schreur's absence. Scales Tr. 11.

The final basis for Perry's Step Three discipline was an incident in which Perry allegedly displayed "unprofessional emotional behavior."  Ms. Scales testified that after receiving a phone call, Perry seemed very upset and began crying in Covenant's front office. *See* Scales Tr. 6-8.  A nurse practitioner named Sandra Wilbanks also observed this incident, and testified that Perry was sobbing at the front desk.  *See* Wilbanks Tr. 3.  Asked to describe the "sobbing" Ms. Wilbanks explained, "[t]ears rolling down her face, shaking, sobbing." *Id.* Ms. Scales testified that she provided Perry with a Kleenex and asked her if she needed to "go to the back" for a few minutes or if she needed to go home.  Scales Tr. 6-8.  Perry ultimately determined that she needed to go home. *Id.* Both Ms. Wilbanks and Ms. Scales testified that there was a patient in the waiting room at the time of the incident, however Ms. Scales testified that she did not know whether the patient saw Perry crying and did not witness any resulting disruption amongst the office personnel. *See* Wilbanks Tr. 3, Scales Tr. 6-8.  Ms. Scales further testified that she did not report the incident to Ms. Krueger, but later informed a manager named Becky. Scales Tr. 8. The corresponding Step Three discipline report notes that three office staff personnel and providers witnessed Perry crying at the front desk and informed Ms. Krueger of the incident. The report states that Perry's behavior was disruptive and that patients were present in the waiting room at the time and could see Perry in the office. *Id*. The report further notes that Perry's behavior violated the standard of conduct set forth in Policy 509. *Id*. In challenging this disciplinary action, Perry claimed that she had just teared up and that no patients had been present to witness the episode.  Perry Tr. 72-73.

**iii.**

After her Step-Three disciplinary counseling, Perry applied for review of her discipline pursuant to Covenant's Alternative Dispute Resolution appeal procedure. *See* Perry Tr. 74-76. Pursuant to that process, an employee may submit documentation and submit witnesses to challenge disciplinary actions.

To challenge her Step One discipline Perry asked a subordinate, Carly Roque, to prepare a statement on her behalf. Perry Dep. 56.  In her statement, Ms. Roque stated that she had witnessed a phone call between Perry and a patient in October, 2014 in which a patient requested a refill of his medication. *See* Trial Ex. 27.  According to Ms. Roque, because the patient had not had an appointment in about a year Perry requested that he come in to the office for an appointment. *Id*. Ms. Roque stated that Perry did not yell and was not rude to the patient. *Id*. At trial, Ms. Roque testified that she was truthful in her statement, but felt pressured by Perry's request for the statement and felt that she should not have been asked to provide the statement. Ms. Roque further testified that she had never been asked by a previous supervisor to furnish such a statement. *See* Scales Tr. 3-5. Specifically, she testified that "I don't think a supervisor should ask an employee to do that." *Id*.

To challenge her Step Three discipline, Perry called Ms. Scales on a Saturday and asked her to provide a statement that there were no patients in the waiting room at the time of the crying incident. Perry Tr. 75-77.  Perry also asked Ms. Scales for a statement explaining that Perry had called her on the day that Ms. Schreur had to attend the meeting at HR. *Id*.  Perry asked Ms. Scales to have the statement ready by that Monday evening. *Id*. at. 59.

When Perry went to the office to collect the statements, Ms. Roque provided Perry with her witness statement, but Ms. Scales did not. *See* trial Ex. 27.  Instead, Ms. Scales acted

- 9 -

nervous, and asked Perry if should could provide Perry with the statement the next day since she was "too busy" that day. *See* Perry Tr. 76-77. The next morning, Perry texted Ms. Scales to say, "[l]et me know if you need me to cover so you can do that note. It doesn't have to be anything crazy long just the facts. Even handwritten. And you could even fax it to me. Just let me know." Trial Ex. 28. Perry then sent another message stating, "[i]f you don't want to do it it's fine too. Just let me know." *Id*. In response, Ms. Scales texted Ms. Perry, "Mandy I feel bad for what your [sic] going through right now. I just feel like with me being new I don't really want to get involved. I was thinking over the weekend and I don't recall the details of what we discussed. I'm sorry." *Id*.

## C.

Perry's attempt to obtain witness statements ultimately led to her Step Four discharge. After hearing Ms. Scales and Ms. Roque discussing Perry's requests for statements, Ms. Wilbanks reported Perry's conduct to Ms. Krueger. *See* Trial Ex. 29; Wilbanks Tr. 1-3. Ms. Kreuger then called Ms. Roque and Ms. Scales to verify that Perry had indeed asked them for witness statements. *Id*. Ms. Scales informed Ms. Krueger that Perry had asked her to make two statements on her behalf: (1) that Ms. Scales "recalled the conversation that [Perry] had with her regarding office staffing and the provider schedules pertaining to the date/time that one of the clinical staff needed to report to HR for a meeting" and (2) "that there were no patients in either the office or the waiting room on the Friday that [Perry] was upset and crying at the front desk." *Id*. The Step Four report notes that this conduct constituted "[f]alsifying claims, records, or reports including incident reports…" and "[i]mmoral, indecent, illegal, or unethical or dishonest conduct or behavior" under Policy #509. Perry was discharged, effective November 25, 2014 after a meeting with Ms. Krueger and Ms. Killey. *Id*. Perry refused to sign the Step Four report.

*Id.* Perry also received a notice of termination, stating that she had been discharged due to her "[i]nability to perform as an effective leader." Resp. to Summ. J. Ex. 21.

Perry challenged both her Step Three corrective action and her Step Four discharge. *See* Trial Ex. 46. The disciplinary actions were first upheld by Ms. Krueger on December 8, 2014. *Id.* Perry then met with David H. Nall, the vice president of the Covenant physician network, and Lisa Killey from human resources. Trial Ex. 31; *see also* Nall Dep. 6, 12. After the meeting, Mr. Nall again upheld Perry's discharge in a letter dated January 12, 2015. Trial Ex. 31. Mr. Nall's letter explained that, while Perry had the ability to complete task-oriented responsibilities, her "challenges came with the skills and abilities required to lead and advise staff amongst various levels of communication and establishing expectations." *Id.* Mr. Nall testified that in reaching his decision he reviewed Ms. Krueger's notes, the disciplinary reports, and Perry's appeal letters. *See* Nall Dep. 6-7. He did not conduct any independent investigation. *Id.*

## II.

Federal Rule of Civil Procedure 50(a) allows a party to make a motion for judgment as a matter of law "at any time before the case is submitted to the jury." FED. R. CIV. P. 50(a)(2). Rule 50(b) provides that if a court does not grant a motion for judgment as a matter of law during trial, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law." FED. R. CIV. P. 50(b). In ruling on a renewed motion, a court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

- 11 -

Review of a motion for judgment as a matter of law is governed by the same standard as motions for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). As explained by the Sixth Circuit in *Tisdale v. Federal Express Corporation*:

> The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences.[1]

*Tisdale v. Federal Express, Corp.*, 415 F.3d 516, 527 (6th Cir.2005) (quoting *Williams v. Nashville Network*, 132 F.3d 1123, 1130-31 (6th Cir.1997)). Thus, the Court may grant a motion for judgment as a matter of law and take the case from a jury "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1065 (6th Cir.2015) (citing *Radyansky v. City of Olmsted*, 496 F.3d 609, 614 (6th Cir.2007)).

## A.

The FMLA entitles employees to an annual total of twelve weeks of leave for a number of reasons including, inter alia, because of a "'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir.2003) (quoting 29 U.S.C. § 2612(a)(1)(D)). Upon returning from FMLA leave, an employee must be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment. 29 U.S.C. § 2614(a)(1). The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any

---

[1] "[T]his court" expressly referred to in this quote is the 6th Circuit Court of Appeals. However, the Sixth Circuit has concluded that, in federal question cases, the standard of appellate review applied to Rule 50 motions based on sufficiency of the evidence is "identical to that used by the district court." *Williams*, 132 F.3d at 1130-31.

other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id.* at § 2615(a)(2).

The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: (1) the "interference" theory arising under § 2615(a)(1), and (2) the "retaliation" theory arising from § 2615(a)(2). *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). Plaintiff Perry's FMLA claim fell under the retaliation theory. ECF No. 1, ¶¶ 48-60. The central question in an FMLA retaliation case is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir.2006). In answering that question, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id.*

Where, as here, a plaintiff sets forth an FMLA retaliation claim based on circumstantial evidence alleging a single motive for discrimination, it is evaluated by the Court – not by the jury – under the *McDonnell Douglas* burden-shifting framework. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Defendant did not and does not dispute that Plaintiff Perry satisfied her burden of establishing a prima facie case. Nor is it disputed that Defendant articulated a legitimate, nondiscriminatory reason for the adverse employment action – namely, that Plaintiff was unable to meet the reasonable expectations of her job and pressured a subordinate to provide a false statement on her behalf. *See Johnson v. United States Dept. of Health and Human Services*, 30 F.3d 45, 47 (6th Cir. 1994) (holding that poor performance is a legitimate, non-retaliatory reason for terminating an employee).

The only issue before this Court is whether Plaintiff advanced sufficient evidence that Defendant's proffered reason for terminating her employment was pretextual for the question to

be resolved by a jury.  A plaintiff may show pretext by demonstrating that the proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. *Seeger*, 681 F.3d at 285; *Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir.1998). However, as noted by the Sixth Circuit, "[t]he three-part test need not be applied rigidly. Rather, [p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard v. Marion Technical College*, 698 F.3d 275, 285 (6th Cir. 2012). Thus the sole remaining issue for the jury at trial was "discrimination vel non," *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 142-43 (2000) (citation omitted), and Plaintiff had the ultimate burden of persuading the jury that Defendant's proffered reason for terminating Plaintiff was a pretext for unlawful discrimination.

At the summary judgment stage this Court found that Plaintiff had met her burden of identifying sufficient evidence that Defendant's explanation for terminating her employment was not the real reason for her termination, such that the factual dispute should be submitted to the jury. The question to be addressed now is whether the evidence advanced at trial, taken in a light most favorable to Perry, required reasonable minds to come to but one conclusion.  If so, Defendant's motion must be granted.

### 1.

Defendant first argues that Plaintiff Perry failed to establish pretext under the first method at trial by failing to demonstrate that the alleged reason for her termination had no basis in fact. In so arguing, Defendant relies on the "honest belief rule."  This rule provides that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*,

- 14 -

274 F.3d 1106, 1117 (6th Cir. 2001). To determine whether Defendant had an honest belief that Plaintiff was poorly performing her job, the Court engages in the necessarily fact intensive inquiry of "whether [Defendant] can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken* Co., 258 F.3d 488, 494 (6th Cir. 2001). In this regard, the decisional process used by the employer need not be optimal or leave "no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d at 807. "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id*. Although the Court must not "blindly assume that an employer's description of its reasons is honest," the Court should "resist attempting to micro-manage the process used by employers in making their employment decisions." *Id*. "When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id*. at 807-08.

Defendant claims that it honestly believed that Plaintiff Perry was unable to meet the reasonable expectations of her job, and that it made a reasonably informed decision to terminate Plaintiff's employment. At the summary judgment stage, Defendant presented the Court with unsubstantiated notes compiled by Ms. Krueger regarding complaints that she allegedly received from third parties, disciplinary reports filled out by Ms. Krueger, and Ms. Krueger's deposition testimony.  The Court was not provided with any depositions or affidavits of any other Covenant employees to substantiate Ms. Krueger's testimony or reports.  As explained at that time, the case as framed by Defendant's motion presented a question of Perry's word against Ms. Krueger's, requiring the jury to determine whether it believed Ms. Krueger's contentions.

By contrast, at trial Plaintiff presented evidence that Defendant's reason for terminating Perry's employment had a basis in fact. Importantly, Defendant presented the testimony of various Covenant employees, including Ms. Scales, Ms. Roque, and Ms. Wilbanks, whose testimony corroborated the facts surrounding Perry's behavior addressed in the disciplinary reports. Whether the events addressed in the disciplinary reports occurred in fact, the employees' testimony demonstrated that Ms. Krueger, and therefore Defendant, honestly believed that Perry was unable to perform the essential functions of her job, exhibited poor leadership, and exhibited unprofessional behavior. And while Defendant's investigative process leading to its decision to terminate Plaintiff was not optimal, it was not required to be. As recently explained by the Sixth Circuit:

> The evidence that can be used to support the employer's honest belief and the resulting decision varies, but it often involves some kind of investigation. Courts have accepted employment decisions based on other types of evidence, such as records, eyewitness accounts, and information provided by the employee, but they have rejected decisions based entirely on unsupported personal opinions.

*Hartman v. Dow Chem. Co.*, 657 F. App'x 448, 452 (6th Cir. 2016) (internal citation omitted). The question is simply whether the employer made a reasonably informed and considered decision unrelated to Plaintiff's protected activity. At trial Plaintiff Perry did not produce evidence establishing that Defendant failed to make a reasonably informed and considered decision rendering its decisional process "unworthy of credence." *See Smith v. Chrysler Corp.*, 155 F.3d at 807. Because Perry did not meet her burden of establishing that Defendant's purported reason for terminating her employment had *no* basis in fact, the jury's verdict must be upheld under the first method of proving pretext as a matter of law.

**ii.**

Defendant also asserts that Plaintiff's proofs did not justify submitting to a jury the question of whether Plaintiff's alleged poor management did not actually motivate Defendant's decision to terminate Perry's employment under the pretext theory. In other words, Defendant asserts that Plaintiff did not satisfy her burden of proving as a matter of law that FMLA retaliation, and not poor performance, was the real reason for her termination. To establish pretext under this method, a plaintiff "attacks the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant.'" *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* (citing *Manzer*, 29 F.3d at 1084). To make a showing of pretext in this manner, "plaintiff may not rely simply upon his prima facie evidence but must, instead introduce additional evidence of ... discrimination." *Manzer*, 29 F.3d at 1084.

Here Plaintiff advanced arguments under the "did not actually motivate" method of proving pretext while simultaneously disputing Defendant's allegation that she did not meet the reasonable expectations of her job. The Sixth Circuit has stated that using the "did not actually motivate" method of proving pretext is somewhat incompatible with a plaintiff's denial of the underlying factual basis, but has nevertheless allowed plaintiffs to proceed on such a theory. *See Blizzard v. Marion Technical College*, 698 F.3d 275, 287 n.6 (6th Cir. 2012); *See also Hartman*, 2016 WL 4363161, at *4.

**a.**

Plaintiff first argues that her termination was closely related in time to her FMLA leave. Although "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual," *Skrjanc*, 272 F.3d at 317, temporal proximity can be used as indirect evidence to support a claim of pretext. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006). The Sixth Circuit has held that a span of less than three months is sufficient to create an inference of a causal connection.  *See Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two."); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (holding that a three-month time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage).

Here Perry's employment was terminated around four months after she notified Defendant of her own serious health issues and began taking intermittent FMLA leave in late July of 2014. *See* Trial Exs. 14-17. Perry then began taking continuous FMLA leave on August 15, 2014, which spanned to October 6, 2014. Two weeks after returning to work she was placed in Step One Discipline, and she was discharged less than two months later, on November 25, 2014.  Because the time from which Perry's employer was notified that she needed to take FMLA leave was temporally proximate to the time that the disciplines culminating in her termination commenced, temporal proximity provides some evidence of pretext in this matter.

**b.**

As noted above however, a plaintiff must demonstrate more than just temporal proximity to establish that a defendant's explanation for termination was not the motivating factor.

- 18 -

Plaintiff Perry first focuses on what she describes as Defendant's shifting and inconsistent reasons for her discharge as evidence of discrimination. Perry argues that her Step-Four discipline report states that she was terminated for asking a subordinate to falsify a witness statement. She argues that she was then informed in her Notice of Separation that she was terminated because of her inability to be an effective leader, and was then informed in her appeal process that she lacked leadership skills and abilities. An employer's changing and inconsistent rationales for making an adverse employment decision can call into question the credibility of the proffered reason and serve as evidence of pretext. *See Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002).

Yet as pointed out by Defendant, Plaintiff provided no evidence that Defendant's rationale for terminating Perry changed in any way. Instead, the given reasons – asking a subordinate to falsify a witness statement, ineffective leadership, and lack of leadership skills and abilities – are consistent and related explanations. Defendant Covenant's assertions revolve around the single idea that Perry was an ineffective leader and manager who communicated improperly with her fellow employees and subordinates. Plaintiff therefore did not establish any evidence of pretext in this regard.

### c.

Perry next emphasizes her claim that Ms. Krueger "mandated" that Perry take continuous FMLA leave instead of intermittent leave constitutes evidence of discrimination. This is an aberration from the majority of FMLA cases in which a plaintiff-employee argues that the defendant-employer did not sufficiently inform him or her of her rights under the FMLA. In contrast, Plaintiff Perry argues that Defendant Covenant impermissibly pressured her to exercise rights under the FMLA. Plaintiff cites 29 C.F.R. § 825.205(a)(1) in support of this argument,

which provides that "[a]n employer may not require an employee to take more leave than is necessary to address the circumstances that precipitated the need for the leave."

Under the FMLA, an employer has no duty to retain an employee who remains unable to perform the essential functions of the position upon his or her return to work. *See* 29 C.F.R. § 825.214(b); *Edgar*, 443 F.3d at 506-07.  It follows that an employee who takes intermittent FMLA leave must be able to perform the essential functions of her job when she is at work during her intermittent leave period. *See Kleinser v. Bay Park Cmty. Hosp.*, 793 F. Supp. 2d 1039, 1047 (N.D. Ohio 2011). Here, Plaintiff conceded both at her deposition and at trial that she was unable to perform the essential functions of her job at the time Defendant asked her to go on continuous leave.  Based on the testimony, Defendant's request that Plaintiff take continuous leave was not in violation of 29 C.F.R. § 825.205(a)(1), nor was it a violation of Plaintiff Perry's right to take intermittent leave, since by her own testimony intermittent leave was insufficient to address the circumstances.  Ms. Krueger's request therefore does not constitute evidence of impermissible discrimination.

### d.

Perry also suggests that the fact that she was reassigned upon her return to work is evidence of discrimination.  However, Perry did not even attempt to argue that the position was not the same or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *See* 29 U.S.C. § 2614(a)(1).  Furthermore, Perry did not contest Defendant's claim that she was reassigned as part of a general restructuring, and does not argue that the restructuring occurred in response to her exercise of her FMLA rights. *See* 29 U.S.C. § 2614(a)(3) (holding that the substantive right to reinstatement "shall [not] be construed to entitle any restored employee to ... any right, benefit, or position of employment other than

any right, benefit or position to which the employee would have been entitled had the employee not taken the leave."). *See also Arban*, 345 F.3d at 401 (noting that "the right to non-interference with medical leave [] is not absolute.").  Because the evidence showed that Perry's reassignment would have taken place regardless of her exercise of FMLA leave, the reassignment is not evidence of discrimination.

**e.**

In contrast, Perry's evidence that Defendant refused to allow her to retrieve records and personal items from her former office upon her return from FMLA leave was some evidence that the jury could have relied on to find pretext. According to Perry, she was unable to obtain her property from Ms. Krueger for over a week while she was attempting to navigate her new assignments. She was then disciplined by Covenant, specifically by Ms. Krueger, in part for failing to properly manage her new responsibilities. Ms. Krueger then made the decision to skip Step Two discipline for Perry, made the decision to terminate Perry's employment, and made the decision to uphold that termination on appeal.  The jury could therefore conclude from the evidence that Ms. Krueger was acting with a retaliatory motive.

Plaintiff Perry also argues that the proof she marshalled of the different treatment she received from Defendant after exercising her rights under the FMLA is some evidence of retaliation, citing *Lamer v. Metaldyne Co*. LLC, 240 F. App'x 22, 30 (6th Cir. 2007) (w]here an employer treats an employee differently after she [engages in protected conduct] than before she had done so, a retaliatory motive may be inferred."). Perry argues that the evidence demonstrated different treatment through the high evaluation marks she received before taking leave in April and the disciplinary actions she began receiving upon her return. As recently explained by the Sixth Circuit in an unpublished opinion, *Lamer* is only relevant if an employee shows that an

- 21 -

employer treated the employee differently in a comparable situation. *See Hartman*, 2016 WL 4363161, at **5-6. In other words, Plaintiff Perry would need to demonstrate that Defendant was aware of Plaintiff's purported leadership problems before she exercised her FMLA rights and ignored them, and then took disciplinary action only after Perry exercised her FMLA rights. *Id*. At trial Plaintiff did not show any such different treatment.

Importantly, however, both Mr. Nall and Ms. Krueger testified that Perry had leadership issues before exercising her right to FMLA leave. Despite this, Perry did not receive any disciplinary action until she returned from leave. This is evidence of different treatment under *Lamer* such that the jury could reasonably find a retaliatory motive. The jury's finding that Covenant's purported reason for terminating Perry's employment was pretextual is therefore supported by the record evidence.

**B.**

Defendant also moves for judgment as a matter of law as to Plaintiff's claim of discrimination under the PWDCRA. "[L]ike the [American's with Disabilities Act], the PWDCRA generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that, with or without accommodation, do not prevent the disabled individual from performing the duties of a particular job." *Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004). To establish a prima facie case of discrimination under the PWDCRA, a plaintiff must establish: (1) that she is disabled as defined by the PWDCRA; (2) that the disability is unrelated to her ability to perform the duties of her particular job; and (3) that she was discriminated against in one of the ways described in the statute. *Peden*, 680 N.W.2d at 863. Consistent with the tripartite analysis set forth in *McDonnell Douglas*, the defendant must then provide nondiscriminatory reasons for the adverse

action. *Vorachek v. Security Federal Credit Union*, 2009 WL 4506440, at *3 (E.D. Mich. Dec. 1, 2009).

Defendant does not challenge Plaintiff's prima facie case, and so the only issue before this Court is whether Plaintiff met her burden of showing that Defendant's purported reason for terminating her employment was pretextual. For the reasons explained above, Defendant is sheltered by the honest belief rule as a matter of law. Plaintiff thus had the burden of proving as a matter of law that disability discrimination, and not poor performance, was the real reason for her termination. *See Smith,* 220 F.3d at 759 (quoting *Manzer*, 29 F.3d at 1084).

It is undisputed that Plaintiff's disability was related to and affected her ability to perform the duties of her job at the time she went on continuous leave. Indeed, Plaintiff testified at her deposition that, as a result of her mental issues, she was unable to perform the essential functions of her job at that time. Mandating that Plaintiff go on continuous leave at that time thus did not constitute evidence of disability discrimination under the PWDCRA.

However, for the reasons stated above Plaintiff has carried her burden of showing that a retaliatory motive can be inferred from Ms. Krueger's conduct after Perry notified her of her disability and that she was subject to different treatment after the onset of her disability. The jury's finding that Covenant's real reason for terminating Perry's employment was impermissible discrimination is therefore supported by the record evidence. As such, Plaintiff's recovery of emotional damages under the PWDCRA is supported by both the facts and the law.

### C.

In its motion for judgment as a matter of law, Defendant also argues that Plaintiff failed to support her claim for front pay damages as a matter of law. Under the FMLA, a prevailing plaintiff is entitled to receive damages in the amount of "any wages, salary, employment

benefits, or other compensation denied or lost to such employee" as a result of the adverse employment action, and "for equitable relief as may be appropriate." 29 U.S.C. §§ 2617(a)(1)(A)(i)(I) & (a)(1)(B). Front pay is an equitable remedy that is available under the FMLA. *Arban*, 345 F.3d at 406.

"[T]he initial determination of the propriety of an award of front pay is a matter for the court." *Id*. In that regard, a plaintiff seeking "front pay [under the FMLA] must provide the district court with the essential data necessary to calculate a reasonably certain front pay award." *Id*. Courts should consider numerous factors in determining the propriety of a front pay award, including, "an employee's duty to mitigate, the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards." *Id.* (quoting *Roush*, 10 F.3d at 399). Evidence in support of an award of front pay may not be purely speculative. *Arban,* 345 F.3d at 407.

Defendant did not object to Dr. Stafford's expert qualifications. *See* Stafford Tr. P. 3. Instead, Defendant Covenant argues that Dr. Stafford's testimony was impermissibly speculative. At trial, Dr. Stafford observed that Perry's annual income was approximately $35,000 at the time of her termination. *Id*. at 4. He also observed that Perry had some college education, and that she was in a favored part of the labor market. *Id.* at 6. Applying the recognized theory of life cycle earnings, Dr. Stafford concluded that Perry "would have normal career growth in her wages" and that there would be "economy wide inflation." *Id*. at 4. Dr. Stafford therefore projected that Perry's earnings would grow more quickly when she was young, and slow as she neared retirement. Assuming that Perry would retire at the age of 65, and

taking into account benefits, Dr. Stafford calculated that Perry's future lost income as a result of her termination would be $1.6 million. *Id.* at 7.

Dr. Stafford recognized that Perry had partially mitigated her losses by obtaining replacement employment towards the end of 2015. However, he noted that the position was not permanent, paid a salary of only $13.50 per hour, and did not include benefits. *Id.* at 8. Dr. Stafford then calculated the future earnings Perry would likely obtain as a result of her replacement employment, beginning at $20,000 per year, and subtracted that amount from the $1.6 million in lost future earnings resulting from her termination. He concluded that Perry would likely experience $730,812 in lost future earnings as a result of her termination.

On cross-examination, Defendant questioned Dr. Stafford about the fact that he did not take into account unique features of Ms' Perry's career. *Id.* at 15. Defendant next questioned Dr. Stafford's use of an inflation rate of 3.5 percent, which is higher than the actual inflation rate for the past decade. *Id.* Defendant also cross-examined Dr. Stafford about his assumptions about the instability of her replacement employment. *Id.* at 17. Dr. Stafford conceded that if Perry worked full time at her replacement employment, that she would receive $27,000 in her first year instead of the $20,000 he had used in his report. *Id.* at 18. Finally, Defendant pointed out the possibility that Plaintiff could obtain a higher paying job with benefits at any time, and that Plaintiff might not work until she was 65.

Because Dr. Stafford took into account essential data necessary to calculate a reasonably certain front pay award (to the extent any calculation of future loss can be reasonably certain), it was for the jury to decide the appropriate award. Ultimately, the jury determined that Perry should be awarded $445,000 in front pay. *See* Verdict, ECF No. 37. The jury therefore appeared receptive to Defendant's cross-examination, as it did not award Perry the full $730,812

suggested by Plaintiff's expert.    Accordingly, Defendant's argument that Dr. Stafford's testimony was insufficiently speculative is without merit.

## III.

In the alternative, Defendant moves for a new trial pursuant to Federal Rule of Civil Procedure 59, arguing that the jury's verdict was against the weight of the evidence and the award of damages was excessive. Defendant does not raise any specific arguments in support of its request for a new trial, but instead reiterates the same arguments raised in support of its request for judgment as a matter of law.  For the reasons set forth above, Defendant's request for a new trial will be denied.  Judgment will be entered in favor of Plaintiff.

## IV.

Plaintiff has also filed motions for prejudgment interest, liquidated damages, and attorney fees.  Each award category will be addressed in turn.

## A.

Plaintiff Perry first requests an award of prejudgment interest on the jury's verdict.  The FMLA entitles a prevailing party to "the interest on the amount described in clause (i) calculated at the prevailing rate . . . ." 29 U.S.C. § 2617(a)(1)(A)(ii).  *See Dotson v. Pfizer*, 558 F.3d 284, 302 (4th Cir. 2009) ("[P]rejudgment interest on FMLA damages is mandatory rather than discretionary."). The Sixth Circuit has not adopted a single method of calculation of prejudgment interest under the FMLA, and "generally afford[s] the district court great discretion in the calculation of prejudgment interest."  *United States v. City of Warren, Mich.*, 138 F.3d 1083, 1096 (6th Cir. 1998).  The present matter is complicated because Plaintiff also prevailed on her Michigan PWDCRA claim.  Under M.C.L. § 600.6013(1), "[i]nterest is allowed on a money judgment recovered in a civil action…." Under both the FMLA and the PWDCRA, prejudgment

interest is intended to compensate the prevailing party for the delay in receiving its money damages.

Defendant argues that this Court should apply the federal interest rate to Plaintiff Perry's award. Plaintiff argues that this Court should apply the Michigan state interest rate of 1.571 percent. The Sixth Circuit recently addressed the question of the appropriate interest rate in *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473 (6th Cir. 2013), in which the defendants argued that the district court erred in applying the Kentucky statutory interest rate instead of the federal interest rate where the case involved both federal and state law claims. The Sixth Circuit rejected the defendants' argument as follows:

> While it is well-accepted that a federal court sitting in diversity should use the state-law interest rate when awarding prejudgment interest, a federal court hearing a federal claim should apply federal common law rules. Although this may give Defendants some hope, district courts are free to use state law to calculate prejudgment interest even on federal claims. We have held that the method for calculating prejudgment interest remains in the discretion of the district courts, and they are free to look to state law for guidance in determining the appropriate prejudgment interest rate" if they so choose.

*Id.* at 497 (internal citations and quotations omitted).

While Plaintiff points to a number of cases holding that a federal court may use the state interest rate where the federal interest rate is deemed insufficient, Plaintiff has presented no evidence that the federal interest rate is insufficient to compensate her for the lost value of her monetary award in this case. Prejudgment interest will therefore be calculated at the federal rate pursuant to 28 U.S.C. § 1961.

**B.**

Perry next requests liquidated damages that would, in effect, double her backpay award. *See* ECF No. 41. If an employer violates an employee's FMLA rights, the employer may be liable for liquidated damages. "Liquidated damages" is the congressionally assigned term for an

additional award of damages against employers who have violated the FMLA with sufficient culpability to merit doubling the damage award.  29 U.S.C. § 2617(a)(1)(A)(iii).  The relevant question is whether the employer can prove "to the satisfaction of the court that the act or omission which violated [the FMLA] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation" of the FMLA.  *Id.*  There is a strong presumption in favor of awarding liquidated damages that are double the amount of any compensatory damages."  *Thom v. American Standard, Inc.*, 666 F.3d 968, 976 (6th Cir. 2012); *see also Elwell*, 276 F.3d at 840 ("Although in the final analysis, we review a district court's decision on liquidated damages for abuse of discretion, that discretion must be exercised consistently with the strong presumption under the statute in favor of doubling.").

To establish good faith under the FMLA, a defendant must "prove[] to the satisfaction of the court' that the violation of the statute was in 'good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation." *Taylor v. Invacare Corp.*, 64 F. App'x 516, 521 (6th Cir. 2003) (quoting 29 U.S.C. § 2617(a)(1)(A)(iii)). In the present case, the jury found that Defendant terminated Plaintiff's employment because Plaintiff exercised her rights under the FMLA.  *Edgar,* 443 F.3d at 508. In light of this verdict, Defendant cannot meet its burden of demonstrating that it acted in good faith. *See Arban* at 408 (Sixth Circuit rejected a district court's denial of liquidated damages because that decision contradicted the jury's finding that the plaintiff was fired for taking FMLA leave).

Defendant argues that any award of liquidated damages should not include front pay because liquidated damages under the FMLA are limited to compensatory relief under 29 U.S.C. § 2617(a)(1)(A)(iii). Defendant is correct, and so front pay will not be included in the calculation of liquidated damages.

## C.

Finally, Plaintiff moves for attorneys' fees, expert witness fees, and other costs. *See* ECF No. 42. Plaintiff argues that she is entitled such an award under both the FMLA, 29 U.S.C. § 2617(a)(3), and under the PWDCRA, M.C.L. § 37.1606.

### i.

A court may only award "reasonable" fees.  In determining the amount of reasonable attorney's fees, courts apply the "lodestar" approach outlined in *Hensley v. Eckerhart*, 461 U.S. 424 (1983).  The lodestar amount is established by multiplying a reasonable hourly rate by the number of hours expended by attorneys on the case.  *Id.* at 433; *Bldg. Svc. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995).  There is a "strong presumption" that the lodestar figure is reasonable.  *Bldg. Svc.*, 46 F.3d at 1401.  The party seeking attorney fees bears the burden of documenting his entitlement to the award with evidence supporting the hours worked and rates claimed.  *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 617 (6th Cir. 2007).

Plaintiff requests attorneys' fees at a rate of $250.00 per hour for Attorney Mastromarco and a rate of $228.00 for Attorney Mastromarco's associates.  Defendant does not dispute the reasonableness of these rates.  However, Defendant argues that the attorneys' fees claimed by Plaintiff are improper for a number of reasons.

In determining reasonable hours, the Supreme Court held that attorneys seeking fees pursuant to a statute are expected to use the same "billing judgment" as a private attorney would use in billing a client.  *Hensley*, 461 U.S. at 434.  This judgment requires attorneys to make a good faith effort to exclude hours that are "excessive, redundant, or otherwise unnecessary."  *Id.*  The party requesting fees must present the court with enough detail to determine whether the

hours were "actually and reasonably expended in the prosecution of the litigation." *United Slate, Tile and Composition v. G & M Roofing and Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984). The fee applicant "has the burden of demonstrating the reasonableness of hours and the opposing party has the burden of producing evidence against this reasonableness." *Anglo – Danish Fibre Indus. v. Columbian Rope Co.*, 2003 WL 223082, at *4 (W.D. Tenn. Jan. 28, 2003).

Defendant first argues that the billing statements submitted by Plaintiff are unsatisfactorily vague because a number of the entries do not indicate which attorney performed the documented tasks. As pointed out by Plaintiff, because the invoices note the fee for each task, it is possible to determine whether the work was performed by Attorney Mastromarco or an associate. While this will be deemed sufficient in this case, future invoices must specifically identify the attorney that performed each task, or the fee request may be rejected.

Defendant next argues that the narratives set forth in the billing statement do not describe the tasks performed with sufficient detail, including entries such as "trial preparation" and "conference with client." This argument is without merit, as Plaintiff's billing statements sufficiently "identify the general subject matter of [the] time expenditures." *See Hensley*, 461 U.S. at 437 n. 12. Plaintiff was not required to set forth more detailed narratives where doing so could risk disclosing privileged attorney-client communications. Moreover, Defendant has not suggested that the time purportedly spent on trial preparation or in client conferences is unusual or excessive.

Defendant also argues that Plaintiff is impermissibly seeking to recover attorneys' fees for tasks that are clerical in nature. Defendant specifically argues that Plaintiff cannot recover for time spent drafting letters to Attorney Cary. The Sixth Circuit has expressly held that reviewing

- 30 -

and drafting legal correspondence can constitute legal work. *See B & G Min., Inc. v. Dir., Office of Workers' Comp. Programs*, 522 F.3d 657, 666 (6th Cir. 2008).  On the other hand, "receiving and filing correspondence presumably constitutes clerical work." *Id*.  Therefore, to the extent Plaintiff's time entries relate to preparing enclosure letters and reviewing return receipts Plaintiff will not be permitted to recover attorneys' fees.

Finally, Defendant argues that certain categories of time entries are excessive, redundant, or unnecessary.  In reply, Plaintiff has agreed to strike any duplicate time entries and to reduce the time for trial attendance from 7.5 to 5.5 hours.  This issue therefore appears to have been resolved by the parties.

## ii.

Plaintiff argues that the Court should increase the lodestar amount to $74,000 due to her Attorneys' experience, reputation, and abilities. In determining whether an alteration to the lodstar amount is warranted, courts must consider the following twelve factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Hensley*. 461 U.S. 430 n. 3.

While Plaintiffs' attorney may be skilled in their specialty, there is no evidence that the issues raised in the case were uniquely novel or difficult, required excessive time or attention, or that the case was undesirable in any way. Because Plaintiff has not overcome the "strong presumption" that the lodestar figure is reasonable, her request will be denied.  *Bldg. Svc.*, 46 F.3d at 1401.  Plaintiff's attorneys' fees are to be determined based on the lodestar calculation.

**iii.**

The parties next dispute the appropriateness of awarding Plaintiff $2,105.00 expert witness fees for the services of Dr. Stafford.  The FMLA requires courts to award prevailing Plaintiffs "reasonable expert witness fees." 29 U.S.C. § 2617.  Defendant argues that Plaintiff's request is unsubstantiated and unreasonable.  Defendant correctly notes that Plaintiff has not included Dr. Stafford's invoice in her billing statements, which would set forth Dr. Stafford's hourly rate or number of hours expended.  In reply, Plaintiff argues that Dr. Stafford listed his hourly rate at $190.00 in his report, which was disclosed to Defendant during the course of discovery and admitted as a trial exhibit.  Applying this rate, Plaintiff argues that Dr. Stafford spent just over eleven hours reviewing material, generating his report, traveling to Bay City, and providing testimony. Defendant has not demonstrated that the rate or hours expended are unreasonable.  While Plaintiff's proofs in this regard leave much to be desired, Plaintiff has demonstrated that her requested expert witness fees are reasonable.

**iv.**

Finally, Defendant objects to Plaintiff's claimed costs.  Defendant argues that Plaintiff has not properly attached documentation, such as receipts, to substantiate her claimed costs. Defendant further argues that Plaintiff is not permitted to recover mediation related costs, attorney travel expenses, court reporter fees, and clerical costs for postage, photocopies, and process service.  Plaintiff has not replied to these arguments.

The Sixth Circuit has held that "[r]ecoverable out-of-pocket expenses are those incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services, such as reasonable photocopying, paralegal expenses, and travel and telephone costs." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 827 (6th Cir. 2013) (internal citations,

quotations, and alterations omitted). On the other hand, mediation costs are only recoverable where such services "confer[] a benefit to the prevailing party by helping to produce a favorable result." *Id.*

Because Plaintiff has presented no evidence that mediation assisted her in obtaining a favorable result, and has not substantiated her claim for Court Reporter's fees or articulated the use to which those transcripts were put, she will not be permitted to recover those categories of costs. The remainder of her claimed fees will be allowed.

**V.**

Accordingly, it is **ORDERED** that Defendant's renewed motion for judgment as a matter of law, or in the alternative for a new trial, ECF No. 40, is **DENIED.**

It is further **ORDERED** that Defendant's motion for an order of judgment, ECF No. 33, is **DENIED as moot**.

It is further **ORDERED** that Plaintiff's motion for prejudgment interest and liquidated damages, ECF No. 41, is **GRANTED IN PART AND DENIED IN PART**. Plaintiff is entitled to prejudgment interest at the rate set by 28 U.S.C. § 1961. Plaintiff is also entitled to liquidated damages as applied to her back pay damages.

It is further **ORDERED** that Plaintiff's motion for attorney fees, expert witness fees, and other costs, ECF No. 42, is **GRANTED IN PART,** subject to the restrictions and limitations set forth above.

It is further **ORDERED** that Plaintiff is **DIRECTED** to submit a proposed judgment via the Utilities Function of CM/ECF on or before **February 27, 2017.**

Dated: February 14, 2017                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on February 14, 2017.

                              s/Michael A. Sian
                              MICHAEL A. SIAN, Case Manager